**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CELINA DARK and TRAVIS BARRY, <br><br> Plaintiffs, <br><br> v. <br><br> TOURO COLLEGE, <br><br> Defendant. | Civil Action No.: 21-cv-7355 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Celina Dark ("Dark") and Travis Barry ("Barry") (together, "Plaintiffs"), by and through their attorneys, Faruqi & Faruqi, LLP, hereby allege as follows against Defendant Touro College ("Touro," the "College," or "Defendant"):

## NATURE OF THE CLAIMS

1.      After having excelled at Touro for years, everything changed for Plaintiffs when the College hired a new Dean to run the Graduate School of Business.

2.      Over the course of several months, the Dean exhibited a clear pattern of subjecting employees of color to disparate performance standards and heightened scrutiny, in addition to marginalizing them in favor of white employees.

3.      On July 20, 2020, Plaintiffs lodged the first of multiple protected complaints regarding the Dean's discrimination.

4.      In response, Touro conducted two cursory investigations—the first by an employee with an obvious conflict of interest—that ignored key evidence, were transparently designed to quash the complaints, and ultimately absolved the Dean of all wrongdoing without any real inquiry into her discriminatory conduct.

5.      Following the sham investigations, Plaintiffs complained to Human Resources that the Dean's discriminatory conduct had persisted (if not worsened) following the investigations.

6.      In response, Touro's Director of Human Resources scheduled meetings with Plaintiffs for the singular purpose of admonishing them for their protected activities and intimidate them from lodging any further complaints.

7.      For example, during his meeting with Dark, he chastised her for making "petty" complaints and accused her of finding something to complain about "no matter what," laying bare his retaliatory animus.

8.      Shortly thereafter, Touro fired Plaintiffs for transparently pretextual stated reasons that in no way warranted termination.

9.      Touro further revealed its retaliatory animus in two nearly identical termination letters, which chastised Plaintiffs for "insubordination," "[i]nterfering with and obstructing the operation, administration, and proper functioning of the College," "[a]cting in an unprofessional and non-collegial manner," "[p]roviding false or misleading information," and "[a]cting in a manner that is not harmonious with and supportive of the activities and functions of an educational institution"—all thinly veiled allusions to their protected complaints.

10.     To redress these wrongs, Plaintiffs bring claims for violations of: (i) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); (ii) Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); (iii) the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL"); and (iv) the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL").

## JURISDICTION AND VENUE

11.    Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiffs' rights under Title VII and Section 1981.

12.    Pursuant to 28 U.S.C § 1367, this Court has supplemental jurisdiction over Plaintiffs' claims arising under State and City law.

13.    Pursuant to 28 U.S.C. § 1391, venue is proper because Defendant's principal place of business is located in this District and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PREREQUISITIES

14.    On or around January 20, 2021, Plaintiffs each filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging, *inter alia*, discrimination and retaliation in violation of Title VII.

15.    On or around August 17, 2021, Plaintiffs each received Notices of Right to Sue from the EEOC.

16.    Fewer than 90 days have passed since Plaintiffs received their Notices of Right to Sue.

17.    Any and all other prerequisites to the filing of this action have been met.

## PARTIES

### A.    Plaintiff Celina Dark

18.    Dark is a resident of the City of New York and was employed by Defendant from on or around August 13, 2018 through on or around November 16, 2020.

19.     At all relevant times, Dark was an "employee" of Defendant within the meaning of all relevant statutes and regulations.

**B.    Plaintiff Travis Barry**

20.     Barry is a resident of the City of New York and was employed by Defendant from in or around September 2013 through on or around November 12, 2020.

21.     At all relevant times, Barry was an "employee" of Defendant within the meaning of all relevant statutes and regulations.

**C.    Defendant Touro College**

22.     Touro is a domestic not-for-profit corporation with its principal place of business located at 500 Seventh Avenue, New York, New York 10018.

23.     At all relevant times, Touro controlled and directed the terms and conditions of Plaintiffs' employment.

24.     At all relevant times, Touro established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs, including, without limitation, timekeeping, work allocation, task supervision, monitoring work product, payroll, and other employment practices that applied to them.

25.     At all relevant times, Touro maintained and exercised the power to hire, fire, discipline, and promote Plaintiffs.

26.     At all relevant times, Touro was Plaintiffs' "employer" within the meaning of all relevant statutes and regulations.

## FACTS

### A. Background

27.     Touro hired Dark, a Black woman, as an Administrative Manager in the College's Graduate School of Business ("GSB") on or around August 13, 2018.

28.     In this role, Dark was responsible for, *inter alia*, managing the GSB's enrollment process, supervising its administrative team, and managing day-to-day operations when the Dean of the GSB was absent.

29.     For the ensuing year, Dark excelled while working under the former Dean of the GSB, Sabra Brock, Ph.D. ("Brock").

30.     Dark's strong performance is evidenced, in part, by the consistently positive feedback she received from Brock, her colleagues, and Touro's students.

31.     Touro hired Barry, who is Latin American and of Ecuadorian descent, as a Marketing Coordinator for the GSB in or around September 2013.

32.     Barry excelled during his eight years at Touro, working tirelessly to make the program competitive and attract new students to the GSB.

33.     His strong performance is evidenced, in part, by the consistently positive feedback he also received from Brock, his colleagues, and Touro students.

34.     Further, Barry was promoted regularly throughout his tenure at the College.

35.     In or around July 2016, Touro promoted Barry to Marketing Manager.

36.     In or around January 2019, Touro promoted Barry again—this time to the role of Marketing Director.

37.     As a Marketing Director, Barry was responsible for, *inter alia*, managing marketing campaigns and creating communications strategies to increase student enrollment within the GSB.

**B.** **Lo Re's Discrimination against People of Color**

38.     On or around July 1, 2019, the GSB replaced Brock with Dean Mary Lo Re ("Lo Re").

39.     Plaintiffs reported to Lo Re from then up until the termination of their employment.

40.     Almost immediately after Plaintiffs began working for Lo Re, they noticed that she subjected her employees to disparate performance standards and scrutiny based on the color of their skin.

41.     In other words, Lo Re treated white employees better than non-white employees such as Plaintiffs and several of their colleagues.

42.     By way of example only, in or around October 2019, Lo Re began targeting and heavily scrutinizing the work of a Black Administrative Assistant (the "Administrative Assistant").

43.     Lo Re made it all but impossible for the Administrative Assistant to manage his workload, including by giving him unclear instructions for his assignments and inconsistent critiques.

44.     This effectively ensured that he could not carry out his responsibilities.

45.     Lo Re then publicly criticized and humiliated the Administrative Assistant in front of his colleagues for minor errors that were caused by Lo Re's confusing directives and feedback.

46.     To the best of Plaintiffs' knowledge, Brock had no issue with the Administrative Assistant's performance during the time he reported to her.

47.     In fact, Brock was so pleased with the Administrative Assistant's performance that she re-hired him in January 2019 after he had previously resigned from Touro to accept another job opportunity.

48.     Shortly thereafter, without any input from those who worked closely with the Administrative Assistant, including Dark (who was his direct supervisor), Lo Re placed the Administrative Assistant on a Performance Improvement Plan ("PIP"), which spanned until in or around April 2020.

49.     In or around February 2020—roughly two months before the conclusion of the PIP—Lo Re swiftly and inexplicably fired the Administrative Assistant, despite failing to provide him with any meaningful guidance on how to improve his purported performance deficiencies.

50.     This left no question that the PIP was designed to ensure the Administrative Assistant's eventual firing, rather than help him improve.

51.     The Administrative Assistant's termination left the GSB's marketing and administrative teams ill-equipped to meet the untenable performance goals and assignment deadlines Lo Re set for people of color on her staff, including, *inter alia*, Dark, Barry, and a Marketing and Admissions Coordinator of Middle Eastern descent (the "Coordinator").

52.     Because the GSB's marketing team relied on the Administrative Assistant for support, Lo Re tasked Dark with the Administrative Assistant's marketing responsibilities, despite Dark's lack of a marketing background and Touro's failure to provide Dark with any formal training.

53.     Touro similarly tasked Barry with new responsibilities that fell outside of his job description (in addition to their already burgeoning workload for the administrative and marketing teams) to fill the vacuum left by the Administrative Assistant's firing.

54.     As Plaintiffs would later detail in several protected complaints to Touro, Lo Re's targeting of them and the Coordinator quickly intensified following the Administrative Assistant's termination.

55.     By way of example only, in or around April 2020, Lo Re chastised and humiliated Dark during a team Zoom meeting for purportedly giving her the wrong student enrollment start date for the upcoming semester.

56.     The GSB's registrar later confirmed to Lo Re that the information Dark had given her was correct; however, Lo Re was unapologetic and her intimidation and mistreatment of Dark continued.

57.     Further, in or around April 2020, Lo Re forbade Barry from logging the total number of hours he worked and refused to pay him for the same.

58.     At that time Barry was completing an occupational therapy residency and working part-time at Touro.

59.     As a result, Touro agreed to limit Barry's work schedule to 73 hours per two-week period.

60.     However, following the Administrative Assistant's termination, Lo Re consistently required Barry to work well over 73 hours per two-week period, including often working on weekends.

61.     In or around April 2020, Lo Re reprimanded Barry for logging 92 hours in a two-week period, despite the fact that doing so was necessary to keep up with the workload she had assigned to him.

62.     Lo Re also reprimanded Dark for approving Barry's hours for that week.

63.     During this conversation, Lo Re told Barry, "Even if you go over 73 hours, don't log them."

64.     When Barry objected that it was infeasible for him to complete his weekly tasks in 73 hours, Lo Re responded, "The work has to be done and I'll make changes to the team if we do not make our goals."

65.     Unsurprisingly, Lo Re's warning caused Barry to fear logging the number of hours he actually worked, resulting in his receiving no compensation at all for up to 33 hours of overtime work each week.

66.     Lo Re later antagonized Barry by asking, "You have a Master's degree, so why are you still working at Touro?"

67.     This demeaning question, as well as Lo Re's general indifference to the strain her unreasonable demands had caused Barry, evinced her discriminatory animus.

68.     Simply put, Lo Re would have never responded to a white employee in this manner.

69.     In or around early June 2020, Lo Re belittled Plaintiffs and the Coordinator during several team meetings called to discuss the GSB's academic calendar.

70.     During one such meeting, Dark explained to Lo Re that the Dean of the GSB traditionally creates the academic calendar for the semester.

71.     Lo Re immediately became irate, telling Plaintiffs and the Coordinator that the academic calendar was Dark's responsibility.

72.     Dark politely complained to Lo Re that she felt Lo Re was changing her job responsibilities without warning, in response to which Lo Re barked at her, "Stop talking."

73.     In or around June 2020, Lo Re accused Dark of forwarding the wrong Employee Personnel Action Form ("EPAF") to Human Resources ("HR").

74. Despite HR later confirming to both that Lo Re, as opposed to Dark, had forwarded the incorrect EPAF, Lo Re continued to blame Dark for this and several other of Lo Re's own mistakes.

75. Even after HR had explicitly notified her that the error was hers, Lo Re yelled at Dark again for purportedly sending the wrong EPAF and told her, "I'm documenting your every action."

76. This left no doubt that Lo Re was subjecting Dark to disparately heightened scrutiny relative to her white peers.

77. Dark had done nothing to warrant such scrutiny.

78. Concerned that Lo Re intended to fire Dark, she asked Lo Re if her job was in jeopardy, to which Lo Re ominously responded, "Oh, I'm not going to fire you… yet."

79. Later that same week, Lo Re sent an email baselessly accusing Plaintiffs and the Coordinator of dishonesty, hiding information, and fabricating information while providing no examples to support these serious charges.

80. The trio responded via email, denying the baseless accusations and attempting to open up a discussion with Lo Re regarding the everchanging assignment deadlines and expectations she imposed upon them.

81. Lo Re did not respond.

82. Prior to a scheduled staff meeting in or around July 2020, Dark circulated a list of courses the GSB should consider eliminating from its catalogue.

83. As was clear from Dark's email, the list was merely a draft to be used as a jumping off point for discussion among Lo Re and the members of the administrative team.

84.     Lo Re admonished Dark in front of her colleagues, insisting that the list was final, rather than a draft, and that Dark was incorrect to suggest eliminating the courses she had identified.

85.     Upon information and belief, Lo Re did this deliberately to humiliate Dark.

86.     Moreover, when a white employee proposed eliminating the same courses less than a week later, Lo Re lauded him for his ingenuity.

87.     Lo Re also routinely dismissed Barry's proposals regarding marketing strategy out of hand.

88.     However, when white employees—even those who, unlike Barry, had no marketing experience whatsoever—later made those exact same proposals, Lo Re accepted them immediately and commended the suggestions.

89.     This was a common occurrence.

90.     Indeed, on several occasions, Lo Re reflexively and angrily dismissed proposals made by employees of color, only to extol identical proposals made by white employees.

91.     Put differently, Lo Re's discriminatory biases clouded her ability to objectively assess Plaintiffs' proposals—which she later approved wholeheartedly, once offered by white employees—due to the color of Plaintiffs' skin.

92.     Additionally, Lo Re often deliberately excluded Barry from important meetings pertaining to his job functions, which made it extremely difficult to carry out his responsibilities.

93.     Barry often learned about these meetings after the fact from colleagues who were confused as to why he was not invited.

94.     Barry had to rely on these colleagues to update him with the information necessary to perform his job.

95.     Upon information and belief, Lo Re did not treat any white employees in this manner.

96.     It quickly became difficult for Plaintiffs to ignore the disparate treatment to which Lo Re subjected them—ridiculing them and scrutinizing their work in a manner she seemingly reserved for employees of color only.

**C.     Plaintiffs' Protected Complaints**

97.     On or around July 20, 2020, Plaintiffs and the Coordinator lodged the first of several protected complaints to Touro's Compliance Board ("Compliance").

98.     In a joint letter, they complained not only about Lo Re's recent outbursts, but also about her pattern of discriminatory and hostile conduct toward employees of color since she became Dean of the GSB in or around July 2019.

99.     In their letter, Plaintiffs noted, *inter alia*, that Lo Re's intimidating behavior had made their work environment "toxic" and asked that Compliance conduct an investigation.

100.    On or around August 14, 2020, Plaintiffs received a letter from Sabine Charles ("Charles"), the factfinder charged with investigating their protected complaint.

101.    Charles's letter stated that she found "no evidence of environmental harassment stemming from a racially charged atmosphere."

102.    Notably, Charles acknowledged instances where she considered Lo Re's behavior to be "harsh" and lacking "constructive communication."

103.    Charles is an adjunct professor in the GSB who works under the supervision of Lo Re.

104.    This presented an obvious conflict of interest, casting doubt as to whether Charles was capable of conducting a fair and impartial investigation and, by extension, casting doubt upon the legitimacy of her findings.

105.    Further, Charles's letter failed to address any of the documentation Plaintiffs and the Coordinator had provided to Compliance, including, *inter alia*, several recorded Zoom meetings and email exchanges.

106.    This confirmed Plaintiffs' fears that Touro was intent on conducting only a surface-level investigation to quickly dispose of their protected complaint.

107.    On or around August 18, 2020, Plaintiffs appealed Charles's determination to Compliance and HR, expressing their dissatisfaction with Charles's biased, cursory investigation.

108.    In connection with their appeal, Plaintiffs requested that Touro commence a new investigation by a truly neutral factfinder.

109.    On or around August 31, 2020, Touro confirmed receipt of the appeal, which was to be reviewed by Touro's Appeals Committee (the "Committee").

110.    In order to grant Plaintiffs' appeal, the Committee would need to find: (i) evidence that Charles's determination was the result of bias; (ii) new documentation or information not previously available to Charles; or (iii) that Charles's findings were the result of procedural error.

111.    On or around September 9, 2020, Barry met with Director of HR Elan Bar-Am ("Bar-Am") to discuss his allegations; however, the meeting did nothing to assuage Barry's concerns.

112.    On or around September 15, 2020, Dark met with the Committee to discuss her allegations.

113.    On September 19, 2020, Dark met with Bar-Am as well but, as with Barry, the meeting did nothing to assuage her concerns.

114.    Two days later, the Committee ordered a second investigation by a new factfinder "to avoid the appearance of impropriety."

115.    While Plaintiffs were pleased with the decision and welcomed a second investigation, they still had little faith that the new investigator or Touro, generally, would take their allegations any more seriously.

116.    On the contrary, Plaintiffs remained dubious that the College was prepared to require that Lo Re make any meaningful changes to her management style, irrespective of the evidence Plaintiffs submitted.

117.    Plaintiffs also feared Touro planned to retaliate against them for engaging in protected activities.

118.    Their suspicions were confirmed on or around October 2, 2020, when Robert Bailey ("Bailey"), the second factfinder, issued a determination stating that he similarly did not find any evidence of discrimination or workplace harassment.

119.    Bailey concluded that Plaintiffs' complaint was "largely centered on friction in the workplace stemming from [Lo Re's] management style" and recommended HR be involved to offer strategies to foster a more "collegial and productive work environment."

120.    On or around October 26, 2020, having not yet been contacted by HR, Plaintiffs and the Coordinator emailed Bailey to inform him that Lo Re's discriminatory conduct towards her employees of color persisted with no intervention from HR.

121.    In fact, Lo Re's discriminatory treatment toward Barry had only escalated since he made his protected complaints.

122.    For example, in or around late October 2020, Lo Re mandated that Barry have all his work preapproved by Zev Asch, a marketing professor at Touro, before sending it to her.

123.    Lo Re imposed this requirement without justification or explanation.

124.   This is likely because the decision was purely retaliatory and designed to punish Barry for his protected complaints alleging that she subjected him and others to discrimination.

125.   Barry had been working at Touro for more than seven years and the College had never required this level of supervision prior to his protected activities.

126.   Further, on two separate occasions, Lo Re expressly prohibited a graduate assistant from helping Barry with his work, despite the fact that the student had been brought on for the explicit purpose of assisting him.

127.   Specifically, in or around late September 2020, Barry attempted to give the graduate assistant an assignment.

128.   She respectfully declined, as Lo Re had apparently instructed her not to assist Barry with any marketing or enrollment work.

129.   Approximately two to three weeks later, the same graduate assistant asked Barry for an assignment, as no one else had given her any work to do.

130.   Accordingly, Barry asked her to help him with a project.

131.   The graduate assistant then left to obtain Lo Re's approval for the assignment, hoping that Lo Re might finally allow her to work with Barry, as she had been hired to do.

132.   When she returned, the graduate assistant told Barry that Lo Re had again prohibited her from helping him, despite having no other work for her to do.

**D.**   **Plaintiffs' Meetings With HR**

133.   On or around October 28, 2020, Bar-Am contacted Dark via email and requested that she schedule a time to speak with him.

134.   Due to the fact that Lo Re's hostile and discriminatory conduct equally affected Barry, Dark asked that he also be present and proposed a meeting at 9:00 a.m. the following day.

135.    Bar-Am denied Dark's request, telling her he wished to speak with her and Barry separately.

136.    Bar-Am's email exuded retaliatory animus, in particular over Dark's appeal of Touro's initial investigatory findings: "You have requested intervention on more than occasion . . . I see that you have substantial availability on your calendar.  As such, I am calendaring a mandatory meeting."

137.    Bar-Am's allusion to Dark's protected complaints served no apparent purpose other than to chastise her for making them.

138.    It also seemed to stray far from HR's purported goal of fostering a "collegial and productive work environment" (*supra* ¶ 118) among Lo Re and her employees of color.

139.    Bar-Am's frustration with Dark's protected activity apparently outweighed his concern, if any, regarding the disparate treatment Plaintiffs and the Coordinator (along with other employees of color) continued to endure.

140.    Dark met with Bar-Am via videoconference on or around October 28, 2020.

141.    At the outset of the meeting, Bar-Am admonished Dark four separate times not to record their conversation and not to memorialize it thereafter.

142.    It soon became clear to Dark that Bar-Am prohibited her from memorializing the meeting to ensure that there would be no evidence of his ensuing attempt to intimidate her from engaging in further protected activities.

143.    Bar-Am was obviously furious with Dark for lodging protected complaints, raising his voice several times during the meeting and at one point characterizing her protected complaints as "petty."

144.     He also said Dark had somehow personally disrespected him by emailing him on October 26, 2020 to inform him that Lo Re continued to subject Dark and other employees of color to disparate treatment.

145.     Bar-Am's suggestion that submitting another protected complaint following the conclusion of the Compliance investigation was in and of itself disrespectful lays bare his retaliatory animus toward Dark.

146.     Bar-Am further told Dark that, in his opinion, she would find something to complain about "no matter what."

147.     He also blithely dismissed Dark's allegations that Lo Re discriminated against people of color as merely a product of Dark's supposed inability to respect authority.

148.     As Bar-Am explained, "It seems like you have a problem with the Dean and don't understand your position . . . She can do whatever she wants to do."

149.     Bar-Am also asked Dark repeatedly whether she felt she could work with Lo Re.

150.     Each time, Dark told him that she was capable of working with anyone, including Lo Re, so long as she was treated in a non-discriminatory and respectful manner.

151.     Bar-Am grew more irate with each such response.

152.     He was clearly trying to bait Dark into quitting her job and irked that she was not interested in doing so.

153.     Shortly before the meeting ended, in reference to Dark's forwarding of emails and recorded Zoom meetings to Compliance to support her and Barry's complaints, Bar-Am warned her to "think before you act."

154.     Bar-Am's disposition going into the meeting was completely inappropriate—especially for a Director of HR—and smacked of retaliatory intent.

155.    It was clear that he had already made up his mind about Dark: she had complained one too many times, and he had no more patience for it.

156.    Bar-Am also reached out to schedule a meeting with Barry, who similarly requested that they meet jointly with Dark.

157.    Bar-Am again refused and insisted that Barry meet him in person.

158.    Due to a then-recent injury, Barry's doctor had recommended that he stay off his feet as much as possible and work remotely.

159.    As such, Barry requested to meet via videoconference.

160.    Despite having agreed to meet Dark via videoconference, Bar-Am refused to grant Barry this same courtesy and scheduled an in-person meeting for November 11, 2020, despite his request to meet remotely while recovering from his injury.

161.    Ultimately, Bar-Am never met with Barry.

162.    Regardless, Barry had already sealed his fate by demanding that Touro take action earlier through his protected complaints.

**E.    Plaintiffs' Retaliatory Firings**

163.    The very next day, on November 12, 2020, Bar-Am sent Barry a letter notifying him Touro was firing him, effective immediately, ostensibly for his refusal to meet with Bar-Am in person.

164.    The letter further stated that Barry was being fired for allegedly: (i) engaging in "insubordination;" (ii) "[i]nterfering with and obstructing the operation, administration, and proper functioning of the College;" (iii) "[a]cting in an unprofessional and non-collegial manner;" (iv) "[p]roviding false or misleading information;" and (v) "[a]cting in a manner that is not harmonious with and supportive of the activities and functions of an educational institution."

165.    On November 16, 2020, a mere four days after Touro fired Barry, Bar-Am advised Dark that he was firing her too, and sent her a letter the next day.

166.    In the letter, Bar-Am claimed that Touro was firing Dark for forwarding an email to Barry's personal email account in violation of Touro's Code of Conduct.

167.    Much like Touro's stated reason for firing Barry—refusing to meet in-person due to a medical issue—the rationale advanced by the College for firing Dark was transparently pretextual.

168.    Without a doubt, countless Touro employees have insisted on meeting remotely during the COVID-19 pandemic and forwarded emails without suffering any consequences at all.

169.    In fact, Dark has witnessed Lo Re and other employees forward emails from their Touro email accounts to the personal accounts of other individuals without facing any discipline whatsoever, let alone losing their jobs.

170.    Dark's termination letter was also strikingly similar to Barry's.

171.    In addition to offering an equally thin stated reason for Dark's termination, the letter included the same vague and unexplained accusations of: (i) "insubordination;" (ii) "[i]nterfering with and obstructing the operation, administration, and proper functioning of the College;" (iii) "[a]cting in an unprofessional and non-collegial manner;" (iv) "[p]roviding false or misleading information;" and (v) "[a]cting in a manner that is not harmonious with and supportive of the activities and functions of an educational institution."

172.    These identically stated reasons for Plaintiffs' terminations were not only completely pretextual, but amount to admissions of Touro's retaliatory animus.

173.    Neither Dark nor Barry had legitimate performance issues while Touro investigated their protected complaints (or at any other time).

174.    Indeed, the only manner in which Touro could possibly contend Plaintiffs were insubordinate, obstructionist, unprofessional, non-collegial, unharmonious, or unsupportive was by pursuing their complaints of discrimination.

175.    Likewise, Touro's accusation that Plaintiffs provided "false or misleading information" was rather obviously a thinly veiled reference to their protected activities.

176.    While Touro apparently believed (incorrectly) that Plaintiffs' complaints were without merit, they were at all times made in good faith and in no way justified the College's blatantly retaliatory decision to terminate their employment.

177.    As frustrated as Bar-Am or anyone else at Touro might have been with Dark and Barry, their complaints were legally protected and, thus, their terminations were clearly unlawful.

## FIRST CAUSE OF ACTION
## VIOLATIONS OF TITLE VII: RACE DISCRIMINATION

178.    Plaintiffs hereby repeat and reallege the foregoing allegations as if set forth fully herein.

179.    During the full statutory period, Plaintiffs were protected by the provisions of Title VII, 42 U.S.C. §§ 2000e, *et seq.*, and all applicable regulations thereunder.

180.    During the full statutory period, Defendant was subject to the provisions of Title VII, 42 U.S.C. §§ 2000e, *et seq.*, and all applicable regulations thereunder.

181.    By the actions described above, among others, Defendant discriminated against Plaintiffs based on their race and color in violation of Title VII by, *inter alia*, subjecting them to disparate performance standards, subjecting them to heightened scrutiny relative to their white peers, and terminating their employment.

182.    Defendant's unlawful discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' rights under Title VII.

183.    As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

184.    Plaintiffs are further entitled to an award of reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF TITLE VII: RETALIATION

185.    Plaintiffs hereby repeat and reallege the foregoing allegations as if set forth fully herein.

186.    During the full statutory period, Plaintiffs were protected by the provisions of Title VII, 42 U.S.C. §§ 2000e, *et seq.*, and all applicable regulations thereunder.

187.    During the full statutory period, Defendant was subject to the provisions of Title VII, 42 U.S.C. §§ 2000e, *et seq.*, and all applicable regulations thereunder.

188.    As set forth above, Plaintiffs engaged in protected activities under Title VII by, *inter alia*, complaining to Defendant regarding discrimination on the basis of their race and color.

189.    Defendant retaliated against Plaintiffs for their protected activities by, *inter alia*, terminating their employment.

190.    Defendant's unlawful retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' rights under Title VII.

191.    As a direct and proximate result of Defendant's unlawful retaliatory conduct, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

192.     Plaintiffs are further entitled to an award of reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### VIOLATIONS OF SECTION 1981: RACE DISCRIMINATION

193.     Plaintiffs hereby repeat and reallege the foregoing allegations as if set forth fully herein.

194.     During the full statutory period, Plaintiffs were protected by the provisions of Section 1981, 42 U.S.C. § 1981, and all applicable regulations thereunder.

195.     During the full statutory period, Defendant was subject to the provisions of Section 1981, 42 U.S.C. § 1981, and all applicable regulations thereunder.

196.     By the actions described above, among others, Defendant discriminated against Plaintiffs on the basis of their race in violation of Section 1981 by, *inter alia*, subjecting them to disparate performance standards, subjecting them to heightened scrutiny relative to their white peers, and terminating their employment.

197.     Defendant's unlawful discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' rights under Section 1981.

198.     As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

199.     Plaintiffs are further entitled to an award of reasonable attorneys' fees and costs.

### FOURTH CAUSE OF ACTION
### VIOLATIONS OF SECTION 1981: RETALIATION

200.     Plaintiffs hereby repeat and reallege the foregoing allegations as if set forth fully herein.

201.    During the full statutory period, Plaintiffs were protected by the provisions of Section 1981, 42 U.S.C. § 1981, and all applicable regulations thereunder.

202.    During the full statutory period, Defendant was subject to the provisions of Section 1981, 42 U.S.C. § 1981, and all applicable regulations thereunder.

203.    As set forth above, Plaintiffs engaged in protected activities under Section 1981 by, *inter alia*, complaining to Defendant regarding discrimination on the basis of their race and color.

204.    By the actions described above, among others, Defendant retaliated against Plaintiffs for engaging in protected activities by, *inter alia*, terminating their employment.

205.    Defendant's unlawful retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' rights under Section 1981.

206.    As a direct and proximate result of Defendant's unlawful retaliatory conduct, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

207.    Plaintiffs are further entitled to an award of reasonable attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYSHRL: RACE DISCRIMINATION**

208.    Plaintiffs hereby repeat and reallege the foregoing allegations as if set forth fully herein.

209.    During the full statutory period, Plaintiffs were protected by the provisions of the NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

210.    During the full statutory period, Defendant was subject to the provisions of the NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

211.     By the actions described above, among others, Defendant discriminated against Plaintiffs based on their race and color in violation of the NYSHRL by, *inter alia*, subjecting them to disparate performance standards, subjecting them to heightened scrutiny relative to their white peers, and terminating their employment.

212.     Defendant's unlawful discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' rights under the NYSHRL.

213.     As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

214.     Plaintiffs are further entitled to an award of reasonable attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
## VIOLATIONS OF THE NYSHRL: RETALIATION

215.     Plaintiffs hereby repeat and reallege the foregoing allegations as if set forth fully herein.

216.     During the full statutory period, Plaintiffs were protected by the provisions of the NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

217.     During the full statutory period, Defendant was subject to the provisions of the NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

218.     As set forth above, Plaintiffs engaged in protected activities under the NYSHRL by, *inter alia*, complaining to Defendant regarding discrimination on the basis of their race and color.

219.     By the actions described above, among others, Defendant retaliated against Plaintiffs for engaging in protected activities by, *inter alia*, terminating their employment.

220.    Defendant's unlawful retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' rights under the NYSHRL.

221.    As a direct and proximate result of Defendant's unlawful retaliatory conduct, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

222.    Plaintiffs are further entitled to an award of reasonable attorneys' fees and costs.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYCHRL: RACE DISCRIMINATION**

223.    Plaintiffs hereby repeat and reallege the foregoing allegations as if set forth fully herein.

224.    During the full statutory period, Plaintiffs were protected by the provisions of the NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq*., and all applicable regulations thereunder.

225.    During the full statutory period, Defendant was subject to the provisions of the NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq*., and all applicable regulations thereunder.

226.    By the actions described above, among others, Defendant discriminated against Plaintiffs based on their race and color in violation of the NYCHRL by, *inter alia*, subjecting them to disparate performance standards, subjecting them to heightened scrutiny relative to their white peers, and terminating their employment.

227.    Defendant's unlawful discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' rights under the NYCHRL.

228.    As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

229.    Plaintiffs are further entitled to an award of reasonable attorneys' fees and costs.

**EIGTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYCHRL: RETALIATION**

230.    Plaintiffs hereby repeat and reallege the foregoing allegations as if set forth fully herein.

231.    During the full statutory period, Plaintiffs were protected by the provisions of the NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq*., and all applicable regulations thereunder.

232.    During the full statutory period, Defendant was subject to the provisions of the NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq*., and all applicable regulations thereunder.

233.    As set forth above, Plaintiffs engaged in protected activity under the NYCHRL by, *inter alia*, complaining to Defendant regarding discrimination on the basis of their race and color.

234.    Defendant retaliated against Plaintiffs for their protected activity by, *inter alia*, terminating their employment.

235.    Defendant's unlawful retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' rights under the NYCHRL.

236.    As a direct and proximate result of Defendant's unlawful retaliatory conduct, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

237.    Plaintiffs are further entitled to an award of reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Declare that the practices complained of herein are unlawful under applicable federal, State, and City law;

B.      Grant an injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.      Grant Plaintiffs an award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate them for their economic damages;

D.      Grant Plaintiffs an award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate them for all non-monetary and/or compensatory damages they have suffered, including, without limitation, compensation for their mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

E.      Grant Plaintiffs an award of damages in an amount to be determined at trial, plus prejudgment interest, for any and all other monetary and/or non-monetary losses they have suffered;

F.      Grant Plaintiffs an award of punitive damages in an amount to be determined at trial;

G.      Grant Plaintiffs an award of liquidated damages in an amount to be determined at trial;

H.      Grant Plaintiffs an award of reasonable attorneys' fees to the greatest extent permitted by law;

I.      Grant Plaintiffs an award of reasonable costs that they have incurred in this action, including, without limitation, expert witness fees;

J.      Grant Plaintiffs all other available damages to the greatest extent permitted by law; and

K.      Grant such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues of fact and damages.

Dated: September 1, 2021            **FARUQI & FARUQI, LLP**
       New York, New York

                                    By: _/s/ Alex J. Hartzband_
                                        Alex J. Hartzband
                                        Camilo M. Burr

                                    685 Third Avenue, 26th Floor
                                    New York, New York 10017
                                    Telephone: 212-983-9330
                                    Facsimile: 212-983-9331
                                    ahartzband@faruqilaw.com
                                    cburr@faruqilaw.com

                                    *Attorneys for Plaintiffs*